**Z.J. GIFTS D–2, L.L.C., d/b/a Christie's, an Oklahoma Limited Partnership, Plaintiff,**

v.

**The CITY OF AURORA, an Incorporated Municipality, Defendant.**

Civil Action No. 93–M–2310.

United States District Court, D. Colorado.

July 23, 1996.

Arthur M. Schwartz, Michael W. Gross, Denver, CO, for plaintiff.

Charles H. Richardson, Office of the City Attorney, Aurora, CO, for defendant.

## MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MATSCH, Chief Judge.

The plaintiff is an Oklahoma limited partnership, doing business as Christie's at a leased site in the Granada Park Shopping Center located in a B–2 commercial retail zone district in the City of Aurora, Colorado ("Aurora"). That business has been operating since October 30, 1993. It sells and rents video tapes of sexually explicit conduct and also sells lingerie, magazines with sexually explicit content, and sexually oriented novelties. All of these items are for off-site use.

On December 13, 1993, Aurora adopted an ordinance, effective January 21, 1994, codified as Chapter 32.5 of the Aurora Municipal Code ("the Ordinance"). The Ordinance prohibits anyone from operating a "sexually oriented business" without a valid sexually oriented business license issued by the city. § 32.5–21(A). It confines these businesses to industrial zone districts. § 32.5–52(A). The Ordinance is a comprehensive one that requires background investigations of license applicants and managers, limits the location of the businesses relative to one another, sets certain requirements for the interior physical arrangement of business premises, and regulates the acts permitted at each site. The Ordinance describes a sexually oriented business as

an adult arcade, adult bookstore, adult novelty shop, adult video store, adult cabaret, adult motion picture theater, adult theater, or nude model studio.

§ 32.5–2.

Aurora enacted the Ordinance to minimize and control the adverse effects associated with such businesses including reduction in property values, spread of sexually transmitted diseases, and crime. It conducted a review of research on sexually oriented businesses and specifically found that prostitution, pandering, child pornography, possession and distribution of obscene material, possession and sale of controlled substances, and violent crimes against persons and property were aggravated by these businesses.

The plaintiff's second amended complaint filed February 10, 1994, challenges the constitutionality of the Ordinance under the United States Constitution and the constitution of the State of Colorado. Aurora counterclaimed to enjoin the conduct of the plaintiff's business as being in violation of the requirements of the Ordinance. Both parties filed cross motions for summary judgment with extensive briefs and exhibits. Oral argument was heard on March 28, 1996.

Although the plaintiff has raised multiple questions regarding the validity of the Ordinance, the pivotal issue is whether the application of the zoning restriction of that Ordinance to the plaintiff's business constitutes an abridgement of Christie's freedom of speech under the First Amendment made applicable by the Fourteenth Amendment to the United States Constitution. At oral argument, the court narrowed the focus of the inquiry to whether the restrictions imposed by the Ordinance that would require Christie's to relocate in an industrial zone district serve a legitimate governmental purpose. In this case, Aurora has shown that it adopted the subject Ordinance only after careful consideration of the results of a number of studies of the secondary adverse effects of sexually oriented businesses in other cities and after public hearing before the Aurora City Council.

The defendant has demonstrated the legitimacy of its concern for the need to mitigate

crime and public health risks shown to be associated with such adult entertainment as erotic dancing, sexually explicit movie theaters and adult book stores with peep show facilities. Christie's is different because there is no such entertainment on its premises. Aurora also seeks to justify the Ordinance as required to protect property values, and it cites studies from other municipalities tending to support the loss of values when there are sexually oriented businesses in the neighborhood.

The distinction which is of interest here was made by the district court in *ILQ Investments, Inc. v. City of Rochester*, 816 F.Supp. 516 (D.Minn.1993). There the court granted a preliminary injunction restraining enforcement of a similar ordinance against a similar business, although it appears that the bookstore had more of a mix in that only about forty percent of the store floor space was devoted to sexually explicit material. The district court found that none of the studies relied upon by the city of Rochester included the type of business operated by that plaintiff. The district court was reversed by the Eighth Circuit Court of Appeals in *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413 (8th Cir.1994). The appellate court found adequate support for secondary effects from a study in Indianapolis and another in St. Paul. The Indianapolis study appears to be the same or similar to one of the studies relied upon by Aurora. It included the opinions from a survey of real estate appraisers concerning the reduction in value of residential property with the conclusion that "the best professional judgment available indicates overwhelmingly that adult entertainment businesses—even a relatively passive use such as an adult bookstore—have a serious negative effect on their immediate environs." Exhibit A, p. 51, Defendant's Brief in Support of Motion for Summary Judgment. The Eighth Circuit opined that Rochester need not prove that the subject bookstore would have the exact same adverse effects as the adult businesses studied by other cities so long as the city reasonably believed the evidence was relevant and said "[e]ven if Downtown Book and Video is a new type of adult business, it may not avoid time, place, and manner regulation that has been justi-fied by studies of the secondary effects of reasonably similar businesses." 25 F.3d at 1418. Respectfully, this analysis is flawed in that it is directed more toward the subjective intent of the city council than the objective effects on the freedom to communicate.

In the many cases which have addressed the problem of sexually oriented businesses and the efforts of communities to restrict them, the analyses undertaken have followed a pattern of repeating the litany from the Supreme Court in *City of Renton v. Playtime Theatres Inc.*, 475 U.S. 41, 49–50, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986) and other cases that such ordinances are content neutral because they are not designed to suppress the content of the speech—only the secondary adverse effects of sexually oriented business on the neighborhood. There can be no quarrel with that approach in those cases where those effects are well documented in the types of studies which were used by Aurora in considering this Ordinance. If the plaintiff had booths for peep shows on its premises, the issues in this case would then deal with some of the particular restrictions which may be more than necessary to meet the governmental purpose of avoiding or mitigating those secondary effects. The problem here is that none of the material relied on by the city council shows that the business of Christie's bears any relationship to such effects.

Indeed, in the matter of any increase in crime, the evidence is distinctly to the contrary. Deputy Police Chief Michael Stiers told the city council that Christie's had business establishments in Oklahoma City and that there were no reports of crime from them. He also said that there was such a business in Denver, and there were no reports of crime from it. Exhibit D, pp. 13–15, Plaintiff's Brief in Support of Cross-Motion for Summary Judgment. The studies concerning real estate values are nonpersuasive. They seem to be little more than opinions of real estate appraisers based on hypotheticals, and there does not seem to be any distinction made between the type of adult book stores with peep show facilities and those that are engaged solely in the sale or lease of sexually oriented materials for

use elsewhere. Aurora presented no evidence that Christie's presence in the Granada Park Shopping Center had reduced the value of the surrounding commercial properties or of any property in nearby residential zone districts, despite the fact that Christie's had been in business at that location for almost two and a half years at the time of oral argument on the summary judgment motions.

In *Ward v. Rock Against Racism* the Supreme Court said this:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. . . . A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. . . . Government regulation of expressive activity is content neutral *so long as it is justified without reference to the content of the regulated speech.*

491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (citations omitted, emphasis added).

■ If the plaintiff's business is sufficiently dissimilar to the types of businesses associated with the undesirable secondary effects that are of legitimate governmental concern as shown in the studies relied upon by the defendant, then the application of the ordinance to the Christie's store as sought by the defendant in the counterclaim is directed not at crime, public health, or property values. Instead, it seeks to suppress the sexual messages in the store's inventory. In sum, the only significant difference shown between the business of Christie's and the other retail businesses in this zone district is that Christie's sells explicit communications about sexual activity. Thus, it can be justified only by reference to the sexual content of the plaintiff's business.

There is an obvious difference between a package liquor store and a bar, and those differences are noted in liquor licensing requirements. *See,* C.R.S. § 12–47–101, et seq. There is also a qualitative as well as quantitative distinction between sports arenas and sporting goods stores. It is difficult to believe that anyone would suggest that sporting goods stores must be limited to the same zoning areas for sports arenas based on the rise in crime or reduction in residential property values associated with sports arenas. These are simply not similarly situated businesses.

■ The Supreme Court has repeatedly recognized that non-obscene sexual speech is protected by the First Amendment as are many other types of expression considered indecent and disreputable by many. Protective paternalism to exclude such material is not a legitimate function of government even where there is a regulatory authority such as the FCC. *Denver Area Educational Telecommunications Consortium, Inc., et al. v. Federal Communications Comm'n,* —— U.S. ——, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). Although the Court has not yet determined what standard of review is appropriate for government regulation of non-obscene, indecent material, it seems clear at the very least that heightened (intermediate) scrutiny is demanded, even if the regulation is "content-neutral" and imposes only an incidental burden on speech. *Id.* at —— – ——, 116 S.Ct. at 2390–93; *Turner Broadcasting System, Inc. v. Federal Communications Comm'n,* —— U.S. ——, ——, 114 S.Ct. 2445, 2469, 129 L.Ed.2d 497 (1994). The Court described intermediate scrutiny under the First Amendment in *United States v. O'Brien.* A regulation restricting speech will be sustained if:

> it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental *restriction* on alleged First Amendment freedoms *is no greater than is essential* to the furtherance of that interest.

391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (emphasis added).

In *Telecommunications Consortium* the Court invalidated § 10(b) of the Cable Television Consumer Protection and Competition Act of 1992. Enacted for the purpose of

protecting children from "patently offensive" sexual programming, that section requires cable system operators to restrict speech by segregating and blocking "patently offensive" sexual content appearing on leased channels. According to its provisions, sexually "indecent" material is required to be placed on a separate channel that would be blocked until a 30 day advanced written notice to unblock the channel is received from a subscriber. Likewise, the channel must be reblocked within 30 days of a subscriber's request. The Court noted that these block and segregate procedures were not required on unleased channels. Instead, cable operators are required to block or scramble programming on *any* unleased channel that a subscriber does not wish to receive, and "indecent" programming need not be segregated on a separate channel at all. No significant advanced notice is required to block or unblock programs. The Court also recognized the advent of the "V-chip" which automatically identifies and blocks sexually explicit or violent programs according to the wishes of a subscriber. The availability of these less restrictive means of accomplishing the government's legitimate purpose was persuasive evidence that § 10(b)'s restrictions on speech are not "a narrowly, or reasonably tailored effort to protect children. Rather, they are overly restrictive, 'sacrific[ing]' important First Amendment interests for too 'speculative a gain.' " —— U.S. at ——, 116 S.Ct. at 2394 (quoting *Columbia Broadcasting System Inc. v. Democratic National Comm.*, 412 U.S. 94, 127, 93 S.Ct. 2080, 2098–99, 36 L.Ed.2d 772 (1973)).

Two aspects of *Telecommunications Consortium* are significant here. The first is that it involved broadcasting which enjoys the least First Amendment protection of all forms of communication. *Federal Communications Comm'n v. Pacifica Foundation*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3039–40, 57 L.Ed.2d 1073 (1978). The second is that the governmental interest was substantial and unquestioned, to wit: the protection of children from "patently offensive" material as measured by contemporary community standards. Nevertheless, the Court invalidated a provision restricting access to "indecent" materials that was broader than necessary to achieve the governmental purpose.

Aurora's ordinance, although content-neutral as applied to those businesses providing sexual entertainment on their premises, becomes content-discriminatory as applied to a business such as Christie's which offers sexual materials only for off-premises consumption. The access to non-obscene, "indecent" material through purchase and rental for home consumption must receive at least as much First Amendment protection as broadcasting. The differences between the business of selling and renting sexual materials for home use only and providing sexual entertainment on business premises are as great as those between providing sexual entertainment on business premises and cable television broadcasting. The problems well-documented in studies of adult businesses providing sexual entertainment on business premises can no more be generalized to a business like Christie's than they can be to the cable television industry.

There are far less restrictive means of achieving Aurora's purpose with respect to a business like Christie's than the zoning provision that would require it to relocate to an industrial district. Aurora can prohibit the display of "indecent" materials in storefront windows and the sale or rental of such materials to minors. As applied to Christie's, Aurora's ordinance burdens more speech than is necessary. It is "overly restrictive, sacrificing important First Amendment interests for too speculative a gain."

Accordingly, it is

ORDERED that to the extent that the Ordinance requires relocation of the plaintiff's business, it is a violation of the plaintiff's freedom of expression protected by the First and Fourteenth Amendments to the United States Constitution. It is

FURTHER ORDERED that a conference will be held on August 15, 1996, at 1:30 p.m. in the Conference Room, Second Floor, the Byron White United States Courthouse, 18th and Stout Streets, Denver, Colorado, to discuss the remaining issues in this civil action.